## Case No. 11,142.

### PIERCE et al v. The ALBERTO.

[Hoff. Op. 441.]

District Court, D. California. Sept. 3, 1857.

ADMIRALTY — ADJUDICATION BY FOREIGN PRIZE COURT—HOW PROVEN—EFFECT OF CONDEMNATION UPON LIENS — CONVERSION INTO PUBLIC VESSEL.

[1. Our courts cannot question the condemnation by a foreign prize court sitting within the territory of its sovereign of a res sub potestate of said sovereign.]

[2. To bar a maritime lien, a foreign condemnation in prize may be proved without producing the decree.]

[3. A foreign sovereign's conversion of a piratical ship into a public vessel conclusively proves her condemnation as prize.]

[4. A foreign condemnation in prize destroys maritime liens.]

[This was a libel by Nelson Pierce and others against the bark Alberto for materials and supplies.]

Pratt & Bowlin, for libellants.
R. C. & D. Rogers, for claimants.

HOFFMAN, District Judge. The libel in this case is for materials and supplies furnished to the bark Alberto, at this port, in the year 1853. The suit is defended on the grounds: First, that the libellants have not produced sufficient and competent proof to show that the supplies sued for were actually furnished; and, secondly, that the mari-

time lien claimed by them cannot now be enforced against the present owner of the vessel.

It is alleged by the claimants that the Alberto was formerly the bark Caroline; that she conveyed from this port Walker and his companions, on their expedition against the Mexican territory; that she was by the Mexican authorities confiscated for engaging in a piratical attack upon their territory and inhabitants, and for a breach of their municipal revenue laws; that she was converted into and for a long time retained as a public vessel of the Mexican nation; that having been dismasted and otherwise injured by a hurricane, she was by the Mexican government sold at auction to the present owner, by whom she has at great expense been repaired. If these allegations be proved, the defence to this suit is complete.

The principal evidence on which the claimant relies, was obtained on letters rogatory issued out of this court, and duly executed by the Mexican authorities, to whom they were addressed. No judicial sentence of condemnation has been produced—either from the fact, that no sentence was pronounced by a regularly constituted court, or because the records of Mexican tribunals are not kept in a manner to be subsequently produced and authenticated. It is shown, however, by the parol evidence taken under the letters rogatory, that the Caroline arrived at La Paz, Lower California, in October or November, 1853, having left San Francisco under command of Capt. Snow, with Walker and his party on board, with the intention of invading Mexico; that she was abandoned by Capt. Snow, after he had 'landed his party at La Paz, seized Governor Espinosa and Col. Robollendo, and conveyed the former in the vessel to Todos Santos; and that she was taken by the mate to Guaymas, where she was seized by the Mexican government and confiscated. It is further proved that the vessel was, soon after her seizure, converted by the government into a vessel of war, under the name of the "General Santa Anna;" that she remained in that service until the end of 1854, when she was totally dismantled by a hurricane; that the hull, without masts, remained at San Blas until she was sold by the Mexican government to the present claimant for the sum of $800; and that she has since been refitted by him at his own expense. It is also proved that the seizure and confiscation of the bark and her conversion into a Mexican vessel were notorious, and that she was then owned by an individual of the family of John A. Robinson, U. S. consul at Guaymas; that he made no claim and resorted to no means to save her.

The truth of these facts has not been questioned on the part of the libellants and the identity of the Alberto with the Caroline is not only admitted but proved by them. The question, then, to be determined is, whether the production of the Mexican sentence of con-

demnation is indispensably requisite to change the status of the vessel, or to divest any previously existing liens upon her—and can the present libellants, after an interval of four years, enforce their claim against the vessel in the hands of an innocent purchaser?

It was observed by Sir Wm. Scott that a court of admiralty is "disposed to pay particular respect to derivative titles when fairly possessed, and it does this on the plain and general ground that there must be a sequel of transactions continued in a course of time which shall be held conclusive to cure antecedent defects, and to give security to the title of a bona fide purchaser." In the case in which these observations were made, a former British owner sued to recover a vessel which had been captured and sold by the Algerines. It was objected that the seizure was piratical. No decree of condemnation was produced, but it appeared that the Dey of Algiers had directly sanctioned the sale. Sir Wm. Scott says: "As to the mode of confiscation which may have taken place on this vessel, whether by formal sentence or not, we must presume it was done regularly in their way, and according to the established custom of that part of the world. That the act of capture and condemnation was not a mere private act of depredation is evident from this circumstance, that the Dey himself appears to have been the owner of the capturing vessel, at least he intervenes to guarantee the transfer of the ship in question to the Spanish purchaser. * * * Had there been any demand for justice in that country on the part of the owners, there might perhaps have been something more like a reasonable ground to induce this court to look into the transaction, but no such application appears to have been made. The Dey intervened in the transaction as legalizing the act." The court decreed the possession of the ship to be delivered to the purchaser. The Helena, 4 C. Rob. Adm. 4. The case at bar is much stronger, for the piratical attack was here committed by the vessel and her company, and is not imputed to the captors. The vessel was not merely sold with the sanction of the Mexican government, but it was formally adopted into its national marine. The owner was present, and made no reclamation or demand for justice, and the purchaser has bought, at a public sale by the government, a public vessel which had been dismantled by a tempest, and to which his expenditures have imparted its principal value.

It is objected on the part of the libellants that the sentence of condemnation should be produced, in order that it may be seen whether the court pronouncing it had jurisdiction. The force of this objection will be best appreciated by recurring to the nature and object of proceedings before prize courts. A seizure on the high seas by an unauthorized individual is a mere trespass, and produces no change of right; but a seizure by sovereign authority vests the

thing seized in the sovereign; for the fact of possession must have all the beneficial effects of the right of possession, as the justice or propriety of it cannot be inquired into by courts of other nations. But, as all civilized nations pretend to the character of justice and moderation, they have constituted courts with power to inquire into the correctness of captures made under color of their own authority, and to give redress to those who have unmeritedly been injured. These are denominated "prize courts," and the primary object of their institution is, to inquire whether a taking as prize is sanctioned by the authority of their sovereign, or is the unauthorized act of the individual. The decisions of such courts do not, therefore, derive their effect from their abstract justice. They were conclusive, because nowhere subject to revision, and because they establish that the seizure was the act of the sovereign authority, which has, by its prize courts, sanctioned and adopted it. The correctness of the decision, or the propriety of the seizure and condemnation, may become the subject of executive or diplomatic discussion; but the equality of nations forbids the idea that the conduct of one sovereign, or the correctness of the principles upon which he acts, should be submitted to the courts of another. The decisions, therefore, of such courts, are recognized as universally binding.

There are circumstances, however, material to the effect of the sentences of foreign prize courts, into which the other courts may inquire. These are (1) whether the court is held in the territory of the sovereign who constitutes it; and (2) whether the res is sub potestate of the sovereign whose courts condemned it. These circumstances have an immediate relation to the exercise of the court, and its power of acting on the subject; but within its legitimate scope of action, the correctness of its proceedings, or of the rules of decision by which it is governed, cannot be subjected to the review of other courts. Per Mr. Justice Johnson, in Rose v. Himely, 4 Cranch [8 U. S.] 280, from whose opinion the above remarks have been taken. It is apparent that, to give to the libellant the full benefit of every objection which he could urge to the sentence of a foreign prize court, its formal sentence need not necessarily be produced. For the fact whether the court was held in the territory of the sovereign who constituted it, or in that of his ally, and the fact whether the res was sub potestate of the sovereign whose courts condemned it, can be as well inquired into without the production of the formal sentence as with it; and to these inquiries the courts of other nations would seem to be limited. Now, it clearly appears in this case, not only that the vessel was seized under color of the authority of the Mexican sovereignty, but that act was sanctioned and adopted. For the vessel was converted, under the name of the "Gen. Santa Anna," into a Mexican public vessel, and so continued for a considerable time, and until sold. A sentence of condemnation, by a tribunal properly authorized by the Mexican laws or usages, may justly, and in favor of an innocent purchaser, ought to, be presumed. There is no pretence that the tribunal was not held within the territory of the sovereign who constituted it; and the res was at the time of the seizure and condemnation, and for long afterwards, sub potestate of the sovereign by whom it was condemned. If a sale by the authority of the Dey of Algiers, after capture by one of his cruisers, was held sufficient to divest the rights of former British owners, and to warrant the presumption of a sentence of condemnation, the facts of this case surely warrant a similar presumption, especially as no doubt can be entertained of the crime committed by the vessel, and the entire justice of her seizure and condemnation. The fact that the vessel was adopted as a national vessel proves as conclusively as the sale by the Dey of Algiers that the government sanctioned the seizure; and though the sentence of the court is, ordinarily, the only legal organ through which the sanction of the sovereign under color of whose authority the seizure is made can be ascertained, yet, when that sanction clearly and unequivocally appears, as in this case, such a sentence ought to be presumed.

I have thus far considered this case as if the libellant were the former owner of the vessel. He is, however, a material man claiming a lien for supplies. The supplies were furnished in 1853. The libel is filed in 1857. It may well be doubted whether, under the circumstances of this case, the lien has not been lost by prescription. Courts of admiralty must be governed by equitable principles. They are the courts of chancery for the seas. [Carrington v. Merchants' Ins. Co.] 8 Pet. [33 U. S.] 525; Packard v. The Louisa [Case No. 10,652]; Joy v. Allen [Id. 7,552]. The lien now set up is raised by construction of law as collateral security to the contract. It is not regulated by express contract or positive statute. It should therefore be limited to equitable period, considering its nature, the employment of the vessel, and the changes of interest happening in her. It is not alleged that the libellants were not aware of the fate of the vessel. The expedition of Walker, and the circumstances attending it, were of public notoriety. The seizure of the vessel by the Mexican authorities was either known to the libellants, or it could readily have become so. It was naturally to be expected; no effort was made by them to assert their lien before the Mexican tribunals; they allow the vessel to remain more than a year in the public service of Mexico, and finally to be sold to an innocent purchaser, by

whom the greater part of her present value has been imparted to her, and they now libel her in the hands of that purchaser. I am of opinion that the equities of the latter are superior and should prevail. If the fact that she has not been in this port since the supplies were furnished be urged as enough to give a right to maintain this suit, then a similar right could be urged at any distance of time, and no matter how numerous the transfers of property may have been.

As to the time within which maritime liens will be barred, all depends on the circumstances and the equities of the case. Blaine v. The Ch. Carter, 4 Cranch [8 U. S.] 328; 3 Hagg. Adm. 238; The Sarah Ann [Case No. 12,342]; Trump v. The Thomas [Id. 14,206]; The Mary [Id. 9,186]. As a general rule, the lien for mariner's wages ceases if not enforced soon after the end of the voyage; yet circumstances may enlarge the time. Sheppard v. Taylor, 5 Pet. [30 U. S.] 675. When the vessel continues in existence and employed, or is sold without notice, no case has been found, says Mr. J. Woodbury, where the lien for seamen's wages has been extended beyond the end of the next voyage. See Packard v. The Louisa [supra].

It is not shown that, since the transfer to the claimant, the vessel has made a voyage; but it may be presumed that she has done so, as she was purchased by him about three years ago. So far, then, as there are general rules upon this subject, the present case seems to come fully within them; and the particular circumstance of this case, as well as the general disposition of admiralty courts "to pay particular respect to derivative titles," lead to the same conclusion.

I have not thought it necessary to consider other points made by the advocate for the claimants; the reasons already given being sufficient, in my opinion, to determine the judgment of the court. The libel must be dismissed.